476 So.2d 432 (1985)
UNITED LAND INVESTORS, INC., Plaintiff-Appellee,
v.
The NORTHERN INSURANCE COMPANY OF AMERICA, Defendant-Appellant.
No. 17162-CA.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1985.
*433 Cook, Yancey, King & Galloway by Steven H. Beadles, Shreveport, for appellant.
Rogers & White by David White & Graham W. Rogers, Bossier City, for appellee.
Before HALL, MARVIN, LINDSAY, JJ.
LINDSAY, Judge.
Defendant, The Northern Insurance Company of America, appeals from the *434 judgment of the trial court in favor of plaintiff, United Land Investors, Inc., in the action of plaintiff-restaurant owner to recover for loss of earnings under a business interruption clause in an insurance policy issued by the defendant to plaintiff after plaintiff's restaurant was damaged by fire, causing the restaurant to be closed for an extended period of time until it was repaired. For the following reasons, we amend and affirm the trial court judgment.

FACTS
Plaintiff was the operator of a Shreveport restaurant, Amendment XXI, and was insured by defendant against fire loss. The policy provided coverage for loss of the building and loss or damage to the contents. It also provided business interruption coverage up to $60,000.00 for loss of earnings, as those terms were defined in the policy.
On November 8, 1981, plaintiff's business burned. After the fire, various estimates were obtained to pay for damage to the building and its contents, as well as the amounts due under the business interruption clause of the policy. The amounts to be paid by the defendant and accepted by plaintiff had not been resolved by December 22, 1981 so a meeting took place on that date. At that meeting, plaintiff's principal stockholders were present, with their attorney. The defendant was represented by its claim adjuster. At that meeting, it became apparent that disputes existed as to the sums to be paid under the policy, and there was concern as to the accuracy of plaintiff's proof of loss. As a result of that meeting on December 22, 1981, and because the total amounts to be paid under the policy had not been resolved, but recognizing its obligation to pay under the policy, defendant advanced to plaintiff the sum of $25,000. Of this amount, $10,000 was to be credited as compensation for lost earnings, the balance being advanced for replacement and repair of contents. Defendant ultimately paid for all damage to the building and contents and plaintiff does not dispute recovery on these claims.
With respect to the plaintiff's claim for loss of earnings under the business interruption clause of this policy, defendant determined plaintiff suffered a loss of earnings of $18,227.83 and on March 5, 1982, defendant presented to plaintiff what it determined to be the total amount due under the policy for all losses. Plaintiff accepted the payments made by the defendant for damage to the building and contents. However, plaintiff rejected the payment which was offered for loss of earnings, claiming it was due the policy limit of $60,000.00.
The primary issues presented by this litigation are (1) the proper method for calculating the amount of business interruption losses and, (2) the time period for which those losses were to be paid. Plaintiff contends that under the policy, it was entitled to $9,960.00 every 30 days up to $60,000.00.[1] Since the loss occurred in November, 1981 and repairs did not begin until March, 1982, when defendant tendered and plaintiff accepted the full sum necessary to make the repairs, plaintiff argued it was due the policy limit on loss of earnings. Defendant argued plaintiff could have begun the repairs as soon as the cash advance was made in December, 1981. The evidence revealed and the trial court found that repairs could be made within 12 weeks. Defendant's accountant devised a mathematical formula under the terms of the policy aimed at calculating the plaintiff's actual loss of earnings and arrived at the conclusion that plaintiff was due $18,227.23 for loss of earnings during this 12 week period.
Plaintiff filed suit to recover the $60,000 policy limit for loss of earnings subject to a $10,000 credit for the cash advance and also sought penalties and attorney fees, *435 claiming defendant's failure to pay was arbitrary, capricious, and without probable cause. Defendant answered, denying plaintiff's allegations and asserted that the amount of earnings actually lost by plaintiff was $18,227.83.

TRIAL COURT JUDGMENT
The trial court found the business interruption clause of the policy to be ambiguous and construed it in favor of the plaintiff. The court found that plaintiff had fixed monthly expenses of approximately $13,000, which exceeded the policy limit of $60,000 and that the twelve week period in which plaintiff was to make repairs did not begin to run until March, 1982, when defendant tendered payment for the full amount necessary to make the repairs. Based upon these findings, the trial court awarded plaintiff the total policy limit of $60,000, with a credit to the defendant for $10,000 already paid for this loss.

ASSIGNMENTS OF ERROR
Defendant presents several assignments of error essentially alleging the following:
1. The trial court erred in its calculation of the amount of business interruption losses.
2. The trial court erred in the length of time used to calculate business interruption losses.
The plaintiff answered the appeal alleging the trial court erred in denying plaintiff's claim for penalties and attorney fees.

METHOD OF CALCULATING AMOUNT OF LOST EARNINGS DUE TO BUSINESS INTERRUPTION
The insurance policy issued to plaintiff by defendant contained the following language concerning lost earnings:
1. Subject to all the provisions applicable to Section 1 of this policy, except the co-insurance clause and the deductible clause, this policy is extended to insure against loss of earnings resulting directly from necessary interruption of business caused by the perils insured against damaging or destroying, during the policy period, real or personal property (except finished stock) at the premises described in this endorsement, subject to the limit of liability specified above for the premises of which the damage or destruction occurs. For the purposes of this insurance, "perils insured against" shall mean the perils, as defined and limited in the forms and endorsements listed above, for each premises specified and also subject to the provisions of this endorsement.
2. The company shall be liable for:
a. The actual loss sustained by the insured resulting directly from necessary interruption of business, but not exceeding the reduction in earnings less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy. Due consideration shall be given for the continuation of normal charges and expenses, including payroll expenses, to the extent necessary to resume operations of the insured with the same quality of service which existed immediately preceding the loss.
"Earnings" are defined in the policy as follows:
5.a. For the purposes of this insurance, "earnings are defined as net profit plus payroll expense, taxes, interest, rents, and all other operating expenses earned by the business.
The trial court found these provisions of the policy to be ambiguous and construed the policy against the defendant. As a result, the trial court found that the plaintiff had monthly fixed expenses exceeding $13,000 and should receive the policy limit of $60,000 for business interruption losses. *436 We find the trial court erred in holding the policy was ambiguous and in finding plaintiff was due the policy limit of $60,000.
No Louisiana cases exist concerning the interpretation of business interruption clauses. However, similar policy provisions and their alleged ambiguity have been dealt with by other courts. Such clauses containing practically identical language to the clause in question here have been found to be unambiguous and constitute the law between the contracting parties. See Rogers v. American Ins. Co., 338 F.2d 240 (U.S.Ct. of App. 8th Cir.1964); Associated Photographers v. Aetna Casualty and Surety Co., 677 F.2d 1251 (U.S.Ct. of App. 8th Cir.1982); Eastern Associated Coal Corp. v. Aetna Casualty and Surety Co., 632 F.2d 1068 (U.S.Ct. of App. 3d Cir.1980).
We hold that the business interruption clause in the policy in this case is unambiguous. The language of the policy sets forth the formula for calculating the amount actually lost by an insured when business is interrupted, and allows the business to remain inthe same financial condition as before the loss. Although the policy is designed to protect the insured, it is also designed to prevent the insured from being placed in a better position than if no loss or interruption of business had occurred.
In determining the amount to be paid for business interruption losses in this case, the record shows that the formula applied by Mr. Paul Sutphen, defendant's expert accountant, correctly applied the clear language of the policy. In order to arrive at a figure for the loss of earnings, paragraph 5(a) of the policy, supra, defining "earnings" is applied to the financial condition of the business. Mr. Sutphen examined the records of the restaurant from April 1, 1981 to October 1, 1981, a period of 214 calendar days, and determined that the restaurant was losing money to the extent of $48,023. Therefore, there was no "net profit." Mr. Stuphen next calculated the "payroll expenses, taxes, interest, rents, and all other operating expenses ..." of the business and found that the total operating expenses of the business were $168,640. However, the books and records of the business revealed that the business had not "earned" all of its expenses because it had operated at a loss of $48,023. Therefore, since $48,023 of the expenses of the business had not been "earned," that figure was deducted from the amount of total operating expenses, leaving the sum of $120,617 of "earnings." Put another way, the total gross sales of the business amounted to only $120,617. On these gross sales of $120,617, it was costing the business $168,640 to remain in operation. At any rate, after arriving at the "earnings" of the business of $120,617 computed as required by paragraph 5(a) of the policy, Mr. Sutphen testified that the next step is to determine the "actual loss" sustained by the insured by reference to paragraph 2(a) of the policy, supra. When the business closed due to the fire, plaintiff experienced a reduction of earnings of $120,617 as previously mentioned. Under paragraph 2(a) of the policy, from the reduction in earnings is deducted those "charges and expenses which do not necessarily continue during the interruption of the business." Mr. Sutphen's review of the books and records revealed non-continuing expenses to be $74,151. This sum was deducted from the total reduction of earnings of $120,617 for a total reduction in earnings of $46,466. This amount, divided by the 214 calendar business days reviewed, revealed an average daily loss of $217.13. (It should be noted that this figure is a few cents higher than the amount testified to by Mr. Sutphen.) Under the terms of the policy, this is the daily business interruption loss suffered by the business while it was not operational.[2]
*437 Plaintiff does not question the accounting methods used by Mr. Sutphen, or his analysis of the books and records of the business. As a matter of fact, the record shows that plaintiff was given every benefit possible in Mr. Sutphen's analysis.
However, it is plaintiff's contention that it is entitled to collect all its "fixed expenses" which it incurred while the business is not in operation. Plaintiff contends that under paragraph 2(a) of the policy, supra, the phrase "due consideration shall be given to the continuation of normal charges and expenses, including payroll expenses, to the extent necessary to resume operations" should be interpreted to mean that all fixed expenses of the business should be reimbursed under the policy. However, plaintiff's calculation of the amount due failed to consider that it could recover only those expenses "earned" by the business. This was required under the terms of the policy. Plaintiff's calculation failed to consider the fact that the business was operating at a loss.
A review of the record shows that Mr. Sutphen properly calculated the expenses which continued and those which did not and thereby gave "due consideration" to the charges and expenses as required by the policy. We conclude that the policy is not ambiguous. Plaintiff is entitled to recover for its loss of earnings as computed under the terms of the policy, rather than to recover all of its "continuing fixed expenses," computed without regard to the specific provisions of the policy.
Having determined that plaintiff's average daily business interruption loss was $217.13 for each day the business was not operational, we next consider the length of time for which defendant was required to pay this business interruption loss.

TIME PERIOD FOR BUSINESS INTERRUPTION
Paragraph 2.a. of the policy, supra, provides that business interruption losses shall be paid, "for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by date of expiration of this policy." In the context of this case, this policy provision provides that the insurance company shall pay actual losses sustained (as computed under the terms of the policy) from the date of the loss until the building can, with due diligence, be repaired.
Paragraph 3 of the policy provides that the company shall not be liable for more than $9,960 in each consecutive 30 day period following the loss up to a total aggregate limit of $60,000. Although the limit of liability of $9,960 during each 30 day period during which business has been interrupted is 16 2/3 percent, or approximately 1/6 of the total limit of $60,000, there appears to be no six month time limit or "cut-off" date in the policy. The policy provides for a 30-day money limit to be paid until the repairs are made. Therefore, under the terms of the policy, the length of time during which payments are due is the actual length of the business interruption caused by the insured peril. This time may extend until the maximum aggregate policy limit of $60,000 is reached. The period of business interruption for which payments are due may be longer than six months, as it was here.
Defendant argues that plaintiff should have begun repairs immediately after the payment of the cash advance on December 22, 1981. Defendant argues *438 that liability for business interruption losses should be levied only for a twelve week period beginning on November 8, 1981, the date of the loss. However, the policy provisions, "commencing with the date of such damage or destruction" simply refer to the commencement date from which the business interruption loss is to be calculated.
The trial court correctly ruled that plaintiff could not commence repairs until he received the money to complete the work. Until plaintiff and the insurance company had arrived at the amount which was paid, plaintiff was in no position to contract for or begin the repairs to the building. Therefore, plaintiff should recover the business interruption losses from the date of the loss until the repairs were completed 12 weeks after March 5, 1982.
Delay in making payment for structural damage was caused by a combination of factors, including the time necessary for plaintiff to furnish adequate proofs of loss, submission of accurate estimates for repairs by building contractors and the time required for both parties to engage in the negotiations over the amount to be paid. Considering all the factors involved in this case, we find that defendant is liable to plaintiff for the business interruption loss for a total of 202 days at the rate of $217.13 per day, for a total amount of liability of defendant to plaintiff of $43,860.26, with a credit of $10,000 previously paid to plaintiff for this loss.[3]

PENALTIES AND ATTORNEY FEES
In the trial court, plaintiff sought penalties and attorney fees on the undisputed amount of approximately $8,000 due under the business interruption clause. Plaintiff claims defendant was arbitrary and capricious in failing to tender this undisputed amount before March 5, 1982. The trial court denied this demand and plaintiff asserts this as error on appeal. A trial court's conclusion concerning the assessment of statutory penalties is in part a factual determination which should not be disturbed in the absence of a finding that it is manifestly in error. Meshell v. Insurance Company of North America, 416 So.2d 1383 (La.App. 3rd Cir.1982); Cameron State Bank v. American Employers' Insurance Company, 401 So.2d 1090 (La. App. 3rd Cir.1981), writ denied 409 So.2d 674 (La.1981). The trial court's ruling on this issue was not manifestly wrong.
LSA-R.S. 22:658 provides that all insurers shall pay the amount of any claims due an insured within 60 days after receipt of satisfactory proof of loss from the insured. Failure to do so which is arbitrary, capricious, or without probable cause subjects the insurer to a penalty of 12% damages on the total amount of the loss together with reasonable attorney fees. Adequate proof of loss is accomplished when the insurer has adequate knowledge of the loss. Hart v. Allstate Insurance Company, 437 So.2d 823 (La. 1983). To avoid imposition of penalties, the insurer must unconditionally tender to the insured that part of the claim for which there is no dispute. Sibley v. Insured Lloyds, 442 So.2d 627 (La.App. 1st Cir. 1983). This section is penal in nature and should be imposed only in those instances which negate probable cause for non-payment. Moore v. Miller's Mutual Fire Insurance Company of Texas, 406 So.2d 708 (La.App. 2d Cir.1981); Cole v. State Farm Mutual Auto Insurance Company, 427 So.2d 522 (La.App. 3d Cir.1983) writ denied 433 So.2d 710 (La.1983). The burden is on the claimant to prove lack of probable cause, arbitrariness or capriciousness. Batiste v. Pointe Coupee Constructors, Inc., *439 401 So.2d 1263 (La.App. 1st Cir.1981), writ denied 409 So.2d 615 (La.1981).
Testimony at trial indicates defendant contacted an accountant on December 9, 1981 to calculate the amount of liability due under the business interruption clause. On December 17, 1981 the accountant met with plaintiff's bookkeeper. On December 22, 1981, the accountant filed an oral report with the defendant followed by a written report on January 6, 1982. On February 4, 1982, a meeting was held with the accountant, plaintiff, plaintiff's attorney, and an insurance adjuster from the defendant company. Plaintiff and his attorney were not satisfied with the calculations made by the accountant and plaintiff made recommendations toward revising those calculations. Although the accountant did not think the changes were necessary, nevertheless, he incorporated the plaintiff's recommendations and filed a revised report on February 15, 1982. Within less than 30 days, defendant tendered to plaintiff the amount determined to be due under the business interruption clause of the policy. Plaintiff refused the money because it was offered in full settlement of the claim. Defendant then offered the money again on an unconditional basis. However, even up to the date of oral argument before this court, plaintiff has refused to accept defendant's tender. We find that defendant made a timely tender to plaintiff of the undisputed amount due under the business interruption clause and therefore was not arbitrary and capricious in payment of the claim. Further, the record shows that defendant made good faith efforts to bring the claim negotiations to a conclusion. The trial court properly denied plaintiff's request for penalties and attorney's fees.

CONCLUSION
For the reasons stated above, we amend the trial court judgment to reduce the amount thereof to the sum of $43,860.26, with a credit of $10,000 representing the amount previously paid plaintiff on this loss, and as amended, affirm the judgment, costs of the appeal are assessed to the defendant.
AMENDED AND AS AMENDED, AFFIRMED.
NOTES
[1] Paragraph 3 of the policy reads as follows:

3. The company shall not be liable for more than the amount set forth in the limits of liability for each premises above as applicable to "Each 30 Days" for loss in any 30 consecutive calendar days, nor in any event for more than the amount set forth above as in "Aggregate" limit of liability.
[2] The calculations for the loss of earnings of the business are shown as follows:

 REDUCTION OF EARNINGS
NET PROFIT $ 0.00
 ___________
PLUS: OPERATING EXPENSES 168,640.
 ___________
Subtotal 168,640.
 ___________
LESS EXPENSES NOT EARNED [ 48,023. ]
 ___________
EARNINGS 120,617.
 ___________
POST LOSS EARNINGS 0.00
 ___________
REDUCTION 120,617.
 -----------
 LOSS COMPUTATION
REDUCTION IN EARNINGS 120,617.
 ___________
LESS:
 NONCONTINUING EXPENSES [ 74,151. ]
 ___________
Subtotal 46,466.
 ___________
DIVIDE: NUMBER OF DAYS 214
 ___________
AVERAGE DAILY LOSS 217.13
 -----------

[3] The evidence showed that on December 22, 1981, plaintiff received a $10,000 advance to be applied on the business interruption loss. Subsequently, defendant tendered a check to plaintiff in the amount of $8,227.83. This check, although tendered by defendant, and made the subject of a discussion during the trial, was never accepted or negotiated by plaintiff. Even as late as the oral argument before this court, the status of the check had not been resolved. Since that check has not been negotiated as of the time of oral argument, it must be returned to defendant.